IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MIGUEL ANGEL FUENTES CORDOVA, et al., etc., | ) ) ) **PUBLISH** |
| Plaintiffs, | ) ) |
| v. | ) CIVIL ACTION 14-0462-WS-M ) |
| R & A OYSTERS, INC., et al., | ) ) |
| Defendants. | ) |

ORDER

This matter is before the Court on the defendants' motion to dismiss. (Doc. 31). The parties have filed briefs in support of their respective positions, (Docs. 32, 38, 40, 47-48), and the motion is ripe for resolution. After careful consideration, the Court concludes that the motion is due to be granted in part and denied in part.

BACKGROUND

According to the amended complaint, (Doc. 20), the two plaintiffs are migrant workers admitted to work in the United States under the H-2B temporary foreign worker visa program. The plaintiffs worked for the defendants at various times between 2008 and 2014, shucking oysters (separating them from the shell), preparing oysters on the half shell (removing just the top shell), and performing other activities related to oyster processing.

Counts I and V of the amended complaint allege violations of the Fair Labor Standards Act ("FLSA"). Counts II and VI allege violations of the Migrant and Seasonal Agricultural Workers Protection Act ("AWPA"). Counts III and IV assert claims for breach of contract. The defendants seek dismissal of all but the FLSA counts.

## DISCUSSION

**I. AWPA.**

The plaintiffs claim to be "migrant agricultural workers" protected by AWPA. (Doc. 20 at 3). A migrant agricultural worker "means an individual who is employed in agricultural employment" of a certain kind. 29 U.S.C. § 1802(8)(A). Thus, to have a claim under AWPA, the plaintiffs must have been employed in "agricultural employment."

The term "agricultural employment" is defined three ways. The first two definitions require employment in a service or activity within the contemplation of certain provisions of either the FLSA or the Internal Revenue Code. The third defines "agricultural employment" as "the handling, planting, drying, packing, packaging, processing, freezing, or grading prior to delivery for storage of any agricultural or horticultural commodity in its unmanufactured state." 29 U.S.C. § 1802(3).

"In order to fall within the first two definitions of 'agricultural employment,' the work must be performed 'on a farm.'" *Morante-Navarro v. T&Y Pine Straw, Inc.*, 350 F.3d 1163, 1167 (11th Cir. 2003) (quoting 29 U.S.C. § 203(f) and 26 U.S.C. § 3121(g)). The plaintiffs concede their work does not satisfy either of these definitions; instead, they argue that they satisfy the third statutory definition of "agricultural employment." (Doc. 38 at 7-8). The defendants do not deny that shucking oysters and preparing them on the half shell constitutes "handling" the oysters in their "unmanufactured state," but they deny that oysters are an "agricultural … commodity" within the third definition. (Doc. 32 at 8).

The first two definitions of "agricultural employment" were part of the original Farm Labor Contractor Registration Act of 1963 ("FLCRA"). The third definition was added by the 1974 amendments to the FLCRA, and all three definitions were carried over unchanged into AWPA (which replaced the FLCRA)

in 1983.[1]  Even though the third definition of "agricultural employment" has been on the books for over 40 years, it appears that only in the past few months have litigants begun to insist that it encompasses work with products of the sea.  Two sister courts have recently ruled that oysters do not constitute an "agricultural commodity" under AWPA.  *See Bojorquez-Moreno v. Shores & Ruark Seafood Co.*, ___ F. Supp. 3d ___, 2015 WL 1236765 (E.D. Va. 2015); *Araiza-Calzada v. Webb's Seafood, Inc.*, ___ F. Supp. 3d ___, 2014 WL 4452228 (N.D. Fla. 2014).  The Court now adds its voice to that chorus.

"As in any statutory construction case, we start, of course, with the statutory text, and proceed from the understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning."  *Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013) (internal quotes omitted).  Neither "agriculture" nor "agricultural" is a defined term under AWPA, so the Court looks for the ordinary meaning of the terms.

"In determining the ordinary meaning of statutory terms, we often find guidance in dictionary definitions."  *In re: James*, 406 F.3d 1340, 1343 (11th Cir. 2005).  The Supreme Court does so as well.[2]  Indeed, the Eleventh Circuit has reviewed dictionary definitions of "agriculture" in construing Section 1802(3).  *Morante-Navarro*, 350 F.3d at 167-68.

Those definitions are remarkably consistent.  "Agriculture" is "[t]he science, art, and business of cultivating soil, producing crops, and raising

---

[1] *Bracamontes v. Weyerhaeuser Co.*, 840 F.2d 271, 273 (5th Cir. 1988); *Bresgal v. Brock*, 843 F.2d 1163, 1166 (9th Cir. 1987); S. Rep. No. 93-1295 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6441, 6446, 6448; H.R. Rep. No. 97-885 at 5 (1982), *reprinted in* 1982 U.S.C.C.A.N. 4547, 4551.  To the uncertain extent *Morante-Navarro* suggests the third definition first appeared in AWPA, 350 F.3d at 1169, it is mistaken.

[2] The cases are legion, but recent examples include *Yates v. United States*, 135 S. Ct. 1074, 1081 (2015); *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014); *Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012); and *Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011).

livestock; farming,"[3] "[t]he science or art of cultivating soil, harvesting crops, and raising livestock,"[4] or "[t]he science, art and business of cultivating the soil, producing crops, and raising livestock; farming."[5] Numerous online dictionaries provide substantively identical definitions, as did printed dictionaries in earlier periods.[6] As is immediately apparent, all of these definitions tie "agriculture" firmly to dry land.[7] Nothing, in short, supports the suggestion that the ordinary meaning of the term "agriculture," whether in 1974, in 1983, or at any time before or since, has included the growing, harvesting or processing of seafood.[8]

  Of course, to say that undefined statutory terms are "generally" interpreted in accordance with their ordinary meaning is not to say that they invariably are so

---

  [3] American Heritage Dictionary of the English Language 35 (5th ed. 2011) ("American Heritage").

  [4] Black's Law Dictionary 80 (9th ed. 2009).

  [5] Webster's New College Dictionary 23 (3rd ed. 2008) ("Webster").

  [6] Webster's Encyclopedic Unabridged Dictionary of the English Language 29 (1989) (based on The Random House Dictionary of the English Language (1st unabridged ed. 1983)) ("agriculture" is "the science or art of cultivating land in the raising of crops; tillage; husbandry; farming"); *accord In re: Newsome*, 60 B.R. 169, 172 (Bankr. E.D. Va. 1986) (quoting definition from 1975); *Castillo v. Case Farms, Inc.*, 48 F. Supp. 2d 670, 676 n.8 (W.D. Tex. 1999) (quoting definition from 1960); *United States v. Turner Turpentine Co.*, 111 F.2d 400, 405 (5th Cir. 1940); *United States v. Boker & Co.*, 1915 WL 20739 at *1-2 (Ct. Cust. App. 1915).

  [7] This is hardly surprising, since the word derives from the Latin words for land (or field) and cultivation. American Heritage at 35; Webster at 23.

  [8] The *Morante-Navarro* Court quoted a dictionary definition of "agriculture" as "'the science or art of the production of plants and animals useful to man and in varying degrees the preparation of the products for man's use and their disposal (as by marketing).'" 350 F.3d at 1168 (quoting Webster's Third International Dictionary 44 (1986)). It might be argued (though the plaintiffs have not done so) that this definition extends "agriculture" to any plant or animal wherever it may reside, including in the depths of the sea. But the second edition of this dictionary explained that, in this "broader sense," agriculture "includes farming, horticulture, forestry, dairying, sugar making, etc.," *Walling v. Rocklin*, 132 F.2d 3, 6 (8th Cir. 1942), making plain that the only plants and animals encompassed are those that come from the land.

4

interpreted. Thus, for example, "[w]hen text implies that a word is used in a secondary sense and clear legislative purpose is at stake," a court may conclude that Congress did not intend the undefined term to carry its ordinary meaning. *Johnson v. United States*, 529 U.S. 694, 706 n.9 (2000). Without expressly invoking this principle, the plaintiffs seek its protection.

      First, the plaintiffs assert that, regardless of how countless dictionaries define "agriculture," when Congress uses the term "agricultural commodity" it intends to "include fish and shellfish." (Doc. 38 at 13). As proof of this penchant, the plaintiffs point to five statutes in which Congress, both before and after 1983, defined "agricultural commodity" as including various forms of aquatic life. A quick computer search reveals that almost 400 sections of the United States Code employ the term "agricultural commodity," so it is difficult to see how extending the phrase to marine products on five occasions could establish that Congress understands and consistently uses the term differently than the rest of the English-speaking world. On the contrary, the very fact that Congress felt the need to declare the sea's bounty to be an "agricultural commodity" under certain statutory schemes simply underscores how foreign such a concept is; if Congress understood that marine products naturally fall within the universe of agricultural products, defining "agricultural commodity" to include marine commodities would be superfluous.

      Second, the plaintiffs suggest that, even if Congress's occasional definitions of "agricultural commodity" as including marine life do not establish a congressional intention that the term always extend so far (even when not so defined), the Court should import such a definition into AWPA on the theory that, "[o]rdinarily, the same words used in different statutes on the same subject are interpreted to have the same meaning, particularly where one statute is silent." (Doc. 38 at 13). Assuming for the moment that there is such a rule of construction

5

and that it applies to the construction of federal statutes,[9] none of the statutes to which the plaintiffs cite address the same subject as – or even a subject remotely similar to – that addressed in AWPA.

Third, the plaintiffs stress that the 1974 introduction of the third definition of "agricultural employment" served to enlarge the scope of that term. (Doc. 38 at 12-13). This is of course true, but not in any sense helpful to the plaintiffs. As noted, the first two definitions of "agricultural employment" require that "the work must be performed on a farm." *Morante-Navarro*, 350 F.3d at 1167 (internal quotes omitted). The third definition, in contrast, "applies to certain activities regardless of their location." *Id*. at 1169. Thus, canning and other processing work occurring off the farm became covered by virtue of the third definition. *E.g., Bracamontes v. Weyerhaeuser Co.*, 840 F.2d 271, 275 & n.24 (5th Cir. 1988). Likewise, certain forestry work became covered. *E.g., Morante-Navarro*, 350 F.3d at 1169. But the work, wherever performed, must still involve an "agricultural commodity," and the plaintiffs have pointed to nothing in the third definition or in its legislative history even remotely suggesting a congressional intent that marine products be deemed agricultural commodities for purposes of the third definition. In short, while the third definition expanded the reach of "agricultural employment," it did not effect the sea change the plaintiffs desire.

It was far easier to discern in AWPA a congressional intent to treat forestry products as agricultural commodities. Dictionaries were split as to whether "agriculture" extended to forestry,[10] leaving it plausible that Congress intended the more expansive meaning. As noted above, however, dictionaries uniformly limit

---

[9] The plaintiffs cite no authority for the quoted proposition. Except for its final clause (which is apparently the plaintiffs' addition), their proposed rule appears to be taken verbatim from an unattributed secondary authority. *See Massaline v. Williams*, 554 S.E.2d 720, 725 (Ga. 2001) (Carley, J., dissenting) (quoting 73 Am. Jur. 2d Statutes § 233).

[10] *Bracamontes*, 840 F.2d at 274; *Bresgal*, 843 F.2d at 1173.

"agriculture" to land, and there is no more expansive recognized meaning of the term that extends past the shoreline.

Moreover, legislative history affirmatively indicated that AWPA applies to forestry products.  "[S]ome government agencies have permitted the employment of illegal aliens as tree planters, thinners and other forest laborers by awarding contracts to forestry contractors who regularly employ aliens who have illegally entered the United States.  The provisions of this bill and its penalties are intended to apply to such contractors."  S. Rep. No. 93-1295 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6441, 6444.  The Fifth and Ninth Circuits relied on this legislative history in determining that AWPA extends to forestry workers.[11]  The plaintiffs, however, identify no language in the legislative history of either the 1974 amendments or the 1983 enactment of AWPA that could suggest an intention to expand "agricultural commodity" to include marine products.  The Court, in reviewing the primary legislative reports,[12] finds a wealth of land-based references but nothing that could be construed as revealing any congressional inkling it was addressing sea-based products.

Fourth, the plaintiffs assert that migrant and seasonal seafood workers are subject to "exactly the sort of abuses" faced by migrant and seasonal agricultural workers.  Since their problems are the same, the plaintiffs insist it would be "arbitrary" and "irrationa[l]" for Congress to protect the latter group but not the former, and from this they conclude that Congress (to avoid arbitrariness and irrationality) must have intended work with seafood to constitute "agricultural employment."  (Doc. 38 at 6, 8, 12).  This is a slender reed indeed.  "[T]he legislature must be allowed leeway to approach a perceived problem incrementally," and "scope-of-coverage provisions are unavoidable components of most economic or social legislation," which line-drawing is "virtually

---

[11] *Bracamontes*, 840 F.2d at 274; *Bresgal*, 843 F.2d at 1167.

[12] S. Rep. No. 93-1295 (1974); H.R. Rep. No. 97-885 (1982).

7

unreviewable." *Federal Communications Commission v. Beach Communications, Inc.*, 508 U.S. 307, 316 (1993).  For Congress to focus on migrant and seasonal workers dealing with land-based products can scarcely be irrational or arbitrary, given that legislative reports detail rampant abuses of such workers before and after the FLCRA was enacted.[13]  Beyond their ipse dixit, the plaintiffs offer no evidence that migrant and seasonal workers dealing with sea-based products suffer (or suffered in 1974, or in 1983) the same range of abuses, to the same degree, and/or on the same scale.  With no irrational or arbitrary line-drawing to be avoided, it is both unnecessary and improper to attribute to Congress an unexpressed, indiscernible intent to cover those working with marine products.

Finally, the plaintiffs remind the Court that AWPA "is a remedial statute and should be construed broadly to effect its humanitarian purpose." *Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1505 (11th Cir. 1993).  (Doc. 38 at 3, 8).  AWPA's purpose, however, is to protect migrant and seasonal "agricultural workers."  29 U.S.C. § 1801.  Because, as discussed above, "agriculture" is limited to work with land-based plants and animals, so also is AWPA's purpose.  Protecting those working with seafood and other sea-based products is no part of the statute's purpose.

The foregoing discussion exhausts the plaintiffs' efforts to demonstrate through recognized (and novel) rules of statutory construction that AWPA protects them.  The remainder of the plaintiffs' argument is that, regardless of what rules of construction say, the Eleventh Circuit has established a simple test of what constitutes an agricultural commodity, which test they satisfy.  (Doc. 38 at 6-11).

> We conclude that pine straw is analogous to those commodities previously deemed 'agricultural or horticultural.'  Like tree seedlings, evergreen boughs, and mushroom compost, pine straw

---

[13] *E.g.*, H.R. Rep. No. 97-885 at 3 (1982), *reprinted in* 1982 U.S.C.C.A.N. 4547, 4548 ("Evidence received by the committee confirms that many migrant and seasonal agricultural workers remain today, as in the past, the most abused of all workers in the United States.").

8

> is produced by a natural process that can be – and was in this case – enhanced by manual labor and cannot be put to commercial use without human intervention.

*Morante-Navarro*, 350 F.3d at 1172. According to the plaintiffs, *Morante-Navarro* stands for the proposition that anything that is produced by a natural process, that can be enhanced by manual labor, and that cannot be put to commercial use without human intervention is necessarily an "agricultural commodity" for purposes of the third definition. (Doc. 38 at 8). They then proceed to explain why oysters – at least, the oysters at issue here – meet that test. (*Id*. at 8-11).

As noted, the product at issue in *Morante-Navarro* was pine straw – a land-based product. The Eleventh Circuit was not presented with, and did not decide, any antecedent issue regarding whether a sea-based product can constitute an agricultural commodity under AWPA. *Morante-Navarro* may or may not have established a test for whether a land-based product is an agricultural commodity, but it did not establish – and could not have established – that a sea-based product can qualify as an agricultural commodity.

After the briefing schedule was concluded and the motion to dismiss taken under submission, (Doc. 35), the plaintiffs filed another brief raising a new argument: that "[h]arvesting oysters involves the cultivation of soil and the planting of seeds, both of which are included in the definitions of 'agriculture' cited by the *Morante* court." (Doc. 48 at 2). Although the plaintiff's brief was not itself untimely,[14] its assertion of a new argument was. "District courts, including this one, ordinarily do not consider arguments raised for the first time on reply." *Gross-Jones v. Mercy Medical*, 874 F. Supp. 2d 1319, 1330 n.8 (S.D. Ala. 2012) (citing cases and explaining rationale). The plaintiffs' argument is based on nineteenth-century cases and was plainly available to them during the briefing

---

[14] After the defendants filed a three-page supplemental memorandum addressing the just-released *Bojorquez-Moreno* opinion, (Doc. 47), the plaintiffs fought fire with fire by filing a five-page response devoted largely to criticizing that opinion. (Doc. 48).

9

schedule.  They have not identified, and the Court cannot discern, any reason under these circumstances to excuse them from the general rule.

Even had the plaintiffs' argument been timely presented, it would remain ineffective.  According to the plaintiffs, (Doc. 38 at 9-10), the "seeds" involved in oystering are oyster larvae that have attached to a substrate and grown to a minimum size, and the "soil" is the underwater seabed on which the substrate rests. *See also McCready v. State of Virginia*, 94 U.S. 391, 396 (1876); *Araiza-Calzada*, 2014 WL 4452228 at *2.  Again, "agriculture" is limited to land-based products; the mere fact that certain words associated with land-based products may also be associated with some sea-based products does not and cannot magically transform the latter into the former or extend agriculture to the sea.

In summary, the Court concludes that oysters are not an "agricultural commodity" under AWPA.  This means the plaintiffs are not engaged in "agricultural employment," which means they are not "migrant agricultural workers," which means they are not protected by AWPA.  The defendants' motion to dismiss Counts II and VI is thus due to be granted.

## II.  Breach of Contract.

The breach of contract claims are brought pursuant to Alabama law.  (Doc. 20 at 1).  Count III asserts breach of a contract between the defendants and the plaintiffs.  Count IV asserts breach of a contract between the defendants and the Department of Labor ("DOL"), as to which contract the plaintiffs are asserted to be third-party beneficiaries.  Both claims focus on documents the defendants submitted to DOL.

The entity defendant completed a number of "applications for temporary employment certification," using a form ("Form 9142") supplied by DOL.  Section F asks for "job offer information," and Section G asks for "basic rate of pay offered."  For each Form 9142, the entity defendant also completed Appendix B.1, by which it "certif[ied]," inter alia, that "[t]he offered wage equals or exceeds

the highest of the prevailing wage, the applicable Federal, State, or local minimum wage, and the employer will pay the offered wage during the entire period of the approved labor certification."[15]

According to Count III, the terms and conditions in the Form 9142's, the accompanying certifications in Appendix B.1, and "the law and regulations applicable to the H-2B program constituted the employment contracts between Plaintiffs and Defendants." (Doc. 20 at 21). According to Count IV, the Form 9142's, "subsequently approved by DOL, constitute valid and enforceable contracts" as to which the plaintiffs are third-party beneficiaries. (*Id*. at 22).

### A. Contract Between Defendants and Plaintiffs.

The defendants first argue that "no employment contract exists *at common law* between H-2B workers and their employer." (Doc. 32 at 11 (emphasis in original)). The only support the defendants offer for this proposition is the absence of any federal regulation providing (as under the related H-2A program) that "[i]n the absence of a separate, written work contract entered into between the [H-2A] employer and the worker, the required terms of the job order and application … shall be the work contract." 29 C.F.R. § 655.102(b)(14). (Doc. 32 at 12). As noted, the plaintiffs' contract claim is based on Alabama law, not

---

[15] Neither side produced a copy of these documents, but the Court has reviewed the forms on the website to which the plaintiffs cited. (Doc. 38 at 15). The plaintiffs indicate that the current version of Appendix B.1 became effective only in 2011, (*id*. at 22), but they do not identify the language in effect during 2009 and 2010.

Form 9142 has been used since January 2009. (Doc. 38 at 15 n.3). The document in effect prior to that date states that "[t]he following information is submitted as an offer of employment," and among the listed items is "rate of pay." (Doc. 20 at 32). The applicant certifies, inter alia, that "[t]he wage offered equals or exceeds the prevailing wage and I guarantee that, if a labor certification is granted, the wage paid to the alien when the alien begins work will equal or exceed the prevailing wage which is applicable at the time the alien begins work." (*Id*. at 33). Although the plaintiffs mention this document in their briefs, its relevance is not clear, since Counts III and IV tie the contract claims to the Form 9142's. (*Id*. at 21-22).

11

federal law. (Doc. 20 at 1). Neither the defendants nor the two cases on which they rely[16] explain how a federal agency's thoughts on whether a contract exists does or could preclude the existence of a contract under state law. Absent a principled basis for drawing such a conclusion (and the defendants offer none), the Court declines to draw it.

The defendants next insist that "no private right of action exists for H-2B employees." (Doc. 32 at 12). The cases on which they rely stand only for the proposition that workers under the H-2 program have no implied right of action under certain federal laws; they do not state or remotely suggest that there can be no state-law claim for breach of an employment contract with an H-2B worker.

The foregoing discussion exhausts the arguments raised by the defendants in their principal brief. After the plaintiffs in their opposition brief reminded the defendants that their contract claim is based on Alabama law, not federal law, (Doc. 38 at 17-19), the defendants in their reply brief put forth a cursory argument that such a claim is neither properly pleaded nor provable. (Doc. 40 at 7-8). The argument is presented too superficially to merit discussion[17] but, for reasons discussed in Part I, it also is raised too late to be considered.[18]

In summary, the defendants' motion to dismiss Count III is due to be denied.

---

[16] *Bojorquez-Moreno v. Shores & Ruark Seafood Co.*, ___ F. Supp. 3d ___, 2015 WL 1236765 (E.D. Va. 2015); *Garcia v. Frog Island Seafood, Inc.*, 644 F. Supp. 2d 696 (E.D.N.C. 2009).

[17] For example, without citing any authority to the purpose, the defendants insist that either an employment contract cannot be formed unless the offeree is aware of every term of the offer or, if a contract is formed, it cannot include any terms of which the offeree was not subjectively aware. It is not the office of the Court to investigate a party's ipse dixit to determine whether it is legally accurate. Nor did the defendants address the plaintiffs' arguments concerning incorporation of applicable law into a contract and estoppel to deny a contract's terms. (Doc. 38 at 18-19).

[18] The amended complaint asserts on its face that the contract claims are based on "Alabama contract law." (Doc. 20 at 1). The defendants thus were on notice at all times of the state-law nature of Count III.

### B. Contract Between Defendants and DOL.

The plaintiffs identify the key term in the asserted contract between the defendants and DOL as "that Defendants were to pay their H-2B workers the prevailing wage rate in effect for the period of work encompassed by the employers' labor certification applications." (Doc. 38 at 23). "This prevailing wage rate" was "promised" and "constitutes a direct benefit conferred upon the Plaintiffs." (*Id*.). The defendants object that such a promise could not furnish the consideration necessary to form a contract. (Doc. 32 at 13).

"Where a party is under a duty created or imposed by law to do what he does or promises to do, his act or promise is clearly of no value and is not sufficient consideration for a promise given in return." *Griffin v. Hardin*, 456 So. 2d 1113, 1116 (Ala. Civ. App. 1984) (internal quotes omitted) (offer to make weekly payments on a legal judgment furnished no consideration); *accord Mobile Turnkey Housing, Inc. v. Cealfco*, 321 So. 2d 186, 190 (Ala. 1975); *Gloor v. BancorpSouth Bank*, 925 So. 2d 984, 992 (Ala. Civ. App. 2005); *see also Rao v. Covansys Corp.*, 2007 WL 3232492 at *3-4 (N.D. Ill. 2007) (applying this principle in the H-1B context). The plaintiffs acknowledge that "[t]he hourly wages offered in Defendants' labor certification are required by DOL regulation." (Doc. 38 at 19). Thus, the defendants argue, their agreement to pay such wages added nothing to what the law independently required of them.

The plaintiffs do not deny that a contract between the defendants and DOL must be supported by consideration.[19] Nor do they identify any consideration other than the defendants' agreement to pay the prevailing wage. Instead, the plaintiffs argue that the principle on which the defendants rely does not apply here because, at the time the defendants agreed to pay the prevailing wage, they had not

---

[19] *See, e.g., Hardy Corp. v. Rayco Industries, Inc*., 143 So. 3d 172, 180 (Ala. 2013) (listing elements of a contract).

13

yet been granted permission to hire workers under the H-2B program and thus were under no legal obligation to pay them. (Doc. 38 at 24). But the point is that, with or without the Appendix B.1 certifications, the defendants could not hire workers under the H-2B program without being legally obligated by federal regulation to pay them the prevailing wage. The defendants' certification is at best a promise to do what the law independently requires, and it therefore cannot furnish legally adequate consideration under Alabama law.

The plaintiffs' only other argument is that DOL considers an Appendix B.1 certification to create an enforceable contract between an applicant and DOL. (Doc. 38 at 22). The plaintiffs' claim, however, is brought under Alabama law, not federal law, and DOL's position (which is obscure, based on the single citation to the Federal Register on which the plaintiffs rely) does not trump Alabama law regarding the necessary consideration for a contract.

In summary, the defendants' motion to dismiss Count IV is due to be granted.

## CONCLUSION

For the reasons set forth above, the defendants' motion to dismiss is **granted** with respect to Counts II, IV and VI and **denied** with respect to Count III. Counts II, IV and VI are **dismissed**.

DONE and ORDERED this 29th day of April, 2015.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE